**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION AT RIVERSIDE**

**HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) EDCR NO. 12-0092-VAP |
| | ) |
| SOHIEL OMAR KABIR, RALPH KENNETH | ) |
| DELEON, | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, FEBRUARY 9, 2015

10:31 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                ANDRE BIROTTE, JR.
                UNITED STATES ATTORNEY

                SHERI PYM
                ASSISTANT UNITED STATES ATTORNEY
                CHIEF, CRIMINAL DIVISION

                SUSAN J. DEWITT
                CHRISTOPHER GRIGG
                ALLEN CHIU
                ASSISTANT UNITED STATES ATTORNEYS
                UNITED STATES DISTRICT COURT
                3880 LEMON STREET
                SUITE 210
                RIVERSIDE, CALIFORNIA 92501
                (951) 276-6210

    FOR THE DEFENDANT, SOHIEL OMAR KABIR:

                SEAN K. KENNEDY
                FEDERAL PUBLIC DEFENDER

                JEFFREY A. AARON
                MATTHEW LARSEN
                ANGELA VIRAMONTES
                DEPUTY FEDERAL PUBLIC DEFENDERS
                3801 UNIVERSITY AVENUE
                SUITE 150
                RIVERSIDE, CALIFORNIA 92501
                (951) 286-6346

    FOR THE DEFENDANT, RALPH KENNETH DELEON:

                DAVID J. THOMAS
                HANNA, BROPHY, MAC LEAN &
                JENSEN, LLP
                1500 IOWA AVENUE
                SUITE 220
                RIVERSIDE, CALIFORNIA 92507
                (951) 824-2984

1    **RIVERSIDE, CALIFORNIA; MONDAY, FEBRUARY 9, 2015; 10:31 A.M.**

2              THE COURT:  Item No. 6, EDCR 12-92, United States

3    of America versus Sohiel Omar Kabir, Ralph Kenneth DeLeon.

4              MR. GRIGG:  Good morning, Your Honor.

10:31:41  5              Susan Dewitt, Allen Chiu and Christopher Grigg for

6    the United States.

7              MS. DEWITT:  Good morning, Your Honor.

8              MR. CHIU:  Good morning, Your Honor.

9              MR. AARON:  Good morning, Your Honor.

10:31:49 10              Jeffrey Aaron, Federal Public Defender's;

11    Mr. Sohiel Kabir who is present, Your Honor.

12              MR. LARSEN:  Good morning, Your Honor.

13              Matt Larsen for Mr. Kabir.

14              MR. THOMAS:  Good morning, your Honor.

10:32:03 15              David Thomas, on behalf of Ralph Kenneth DeLeon,

16    who is present with me at counsel table.

17              THE COURT:  Thank you.

18              MS. VIRAMONTES:  Good morning, your Honor.

19              Angela Viramontes, on behalf of Sohiel Kabir.

10:32:11 20              THE COURT:  Thank you.

21              All right.  We have provided copies of the

22    tentative rulings on both motions.

23              Have both sides had an opportunity to review the

24    tentatives?

10:32:19 25              MS. DEWITT:  Yes, your Honor.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

| | |
|---|---|
| 10:32:25 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:32:32 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:32:37 | 10 |

10:32:25   1          THE COURT:  Mr. Larsen, have you seen the court's

2    tentative?

3          MR. LARSEN:  Yes, your Honor.  Just in the last

4    few moments.

10:32:32   5          THE COURT:  All right.  And Mr. Thomas?

6          MR. THOMAS:  I have, your Honor.

7    Thank you.

8          THE COURT:  All right.  Mr. Larsen, you may argue

9    first.

10:32:37  10          MR. LARSEN:  Thank you, Your Honor.

11          I would actually like to focus on Count Five,

12    first.  I think it's quite telling that in the two pages of

13    the 60-page brief that the government devotes to Count Five,

14    it does not even claim that there was evidence that

10:32:50  15    Mr. Kabir joined the conspiracy to kill, specifically,

16    officers or employees of the United States.  Not only does

17    the government not claim that there is such evidence, it

18    points to no such evidence.

19          It says that there was evidence that Mr. Kabir

10:33:03  20    wanted to kill.  Now, I'll address that later when I talk

21    about Count One.

22          THE COURT:  I'm sorry to interrupt you.

23      *(Pause.)*

24          THE COURT:  Go ahead.

10:33:18  25          MR. LARSEN:  Thank you, your Honor.

```
10:33:18    1            I'll address the evidence about whether there was

            2    proof of an intent to kill later when I talk about

            3    Count One, but we know that under Count Five that evidence

            4    had to be more specific.  It wasn't enough that there had

10:33:28    5    been no evidence of intent to kill but, specifically, an

            6    intent to kill officers or employees of the United States.

            7            Now, the government points to utterly no evidence

            8    that Mr. Kabir had any such intent or joined any such

            9    conspiracy.  What the government does do, as it did at

10:33:42   10    trial, was revert to its theory that because the other

           11    defendants, all of whom, unlike Mr. Kabir, admitted guilt;

           12    because they said things suggesting an intent to kill

           13    Americans, Mr. Kabir must have had that intent as well.

           14            Your Honor, the law is very clear that such intent

10:33:59   15    cannot be imputed.  In a conspiracy case, as this court --

           16    as the Ninth Circuit held in Peterson, there has to be

           17    independent evidence showing not only that a conspiracy

           18    existed but in addition, Your Honor, that each defendant

           19    specifically and individually joined that conspiracy.

10:34:16   20            The government talks about the evidence that

           21    Mr. Gojali gave at trial and the statement that he made

           22    about his willingness to kill an American, and Your Honor

           23    has cited that in your tentative ruling as well.

           24            We cite, of course, the evidence from the trial.

10:34:32   25    We cite three specific instances in which Mr. Gojali at
```

10:34:36  1    trial, in fact, denied that he had an intent to kill.

2    Putting that mixed evidence aside, Your Honor, the fact of

3    the matter is that what Mr. Gojali said about what he wanted

4    to do is not evidence of what Mr. Kabir wanted to do.

10:34:49  5         THE COURT:  You need to speak more slowly, please.

6         MR. LARSEN:  I'm sorry, Your Honor.

7         The basic point here I'm trying to get across, as

8    I've emphasized to the Court throughout the trial, is that

9    there can be no conviction, based on a theory of guilt by

10:35:01  10   association.  There has to be evidence proving in a

11   conspiracy case that a criminal plot existed as charged in

12   the indictment and that each defendant individually joined

13   that plot.

14        Here, on Count Five, the charge was not a

10:35:12  15   conspiracy to kill.  The charge was conspiracy to kill

16   American personnel.  The government has not pointed to a

17   single piece of evidence in the six-week-long trial that

18   Mr. Kabir joined any such plot.  All that it has done --

19        THE COURT REPORTER:  Excuse me.  All that, what --

10:35:29  20        THE COURT:  You need to slow down.  You'll have to

21   start that sentence.

22        MR. LARSEN:  Sorry, Your Honor.

23        The government has not pointed to a single piece

24   of evidence in the six -- rather, the seven-week-long trial

10:35:40  25   that Mr. Kabir, specifically, agreed to kill American

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:35:44  1  personnel.

2       When the government cannot even point to evidence

3  that is crucial to sustain a conviction, that means the

4  evidence was insufficient.  Here, it's pointed to nothing

10:35:55  5  that Mr. Kabir said or did that would allow a rational jury

6  to find beyond all reasonable doubt that Mr. Kabir agreed to

7  kill U.S. service members or personnel.

8       THE COURT:  Well, he doesn't have --

9       The government is not required to prove that.

10:36:10 10  That's a misstatement of what the burden of proof is.  He's

11  joined a conspiracy.  As long as one of the conspirators

12  intends to do that, that is sufficient.

13       MR. LARSEN:  You're absolutely right, Your Honor.

14  That's right.  And we've never alleged that there had to be

10:36:27 15  proof that Mr. Kabir, personally, wanted to kill anybody,

16  let alone a soldier.  But he did have to have joined a

17  conspiracy harboring the intent that by becoming a member of

18  this enterprise their efforts would be directed toward

19  killing an officer or employee of the United States.  And

10:36:44 20  that's the evidence that we said from the start is lacking

21  and that the government hasn't pointed to.

22       I think it's very telling, also, there were a

23  number of indictments in this case, leading up to the final

24  one.  And in none of the early ones was this charge levied.

10:36:57 25  This charge levied -- this charge was added on at the end,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:37:00  1    after Mr. Kabir refused to plead guilty.  And tellingly, in

2    all of the 60 pages that the government has devoted to

3    reviewing the evidence at trial, it spends two pages talking

4    about this count.  And in those two pages, it doesn't even

10:37:14  5    claim there was proof that he wanted -- that he joined the

6    plot aimed at killing, specifically, U.S. personnel.

7          The evidence, or the allegation -- I think, the

8    evidence on Mr. Gojali -- certainly, the allegations of the

9    government -- is that the others, who were in the

10:37:28 10    United States and who, unlike Mr. Kabir, all admitted guilt

11    in this case, their plan was to travel overseas to fight,

12    amongst others, U.S., British, Australian and U.N. Forces.

13          Now, taking that as true, under a Rule 29 motion,

14    there's no evidence that Mr. Kabir, even if he knew of their

10:37:50 15    plot, not only joined it but joined it with the specific

16    intent to further the deaths, not only of anyone but,

17    specifically, of an American personnel.  That's what

18    Count Five charged.  It's not enough to simply speculate.

19    We know this from the *Nevils* case.  We know this from the

10:38:06 20    *Juan H.* case, when reviewing --

21          THE COURT REPORTER:  Excuse me.  Wait.

22          MR. LARSEN:  I'm sorry.

23          THE COURT:  You need to slow down.  You need to

24    slow down.

10:38:18 25          MR. LARSEN:  I'm sorry.  I do apologize.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:38:18　1          THE COURT:  You can apologize; but if you want

2    your record to reflect what you're saying, you need to

3    slow down.

4          MR. LARSEN:  All right.  I do -- I am used to

10:38:26　5    talking under greater time limits, so I do apologize.

6          Under the *Nevils* case from the Ninth Circuit and

7    under the *Juan H.* case, also from the Ninth Circuit, when

8    reviewing the sufficiency of the evidence when there's a gap

9    in the evidence, it cannot be filled by speculation.  It

10:38:44　10   cannot be filled by a guess.  It can't be filled by an

11   assumption that, *Oh, if the others wanted to kill Americans,*

12   *Mr. Kabir must have as well*, even though we don't have

13   evidence of that.

14         That's the critical failing on this particular

10:38:57　15   count, your Honor.  There's no proof that Mr. Kabir,

16   independently, individually, joined the plot to cause the

17   death of American service members.  This is, especially, so,

18   Your Honor, when we look, as we have to, at all of the

19   evidence in the case.

10:39:14　20         And I'm going to talk about this, I think, in

21   greater detail under Count One.  I think for purposes of

22   Count Five, my comments are going to be relatively brief,

23   because there's no evidence supporting Mr. Kabir's

24   conviction on Count Five.  That's the fact that we simply

10:39:29　25   can't get around in this case.

10:39:31 1        THE COURT:  All right.  Let me let -- I'll let you

2   argue as to the other counts, but let me let Counsel for the

3   government respond as to Count Five.

4        MR. LARSEN:  Certainly.

10:39:39 5        THE COURT:  Ms. Dewitt.

6     (Pause.)

7        THE COURT:  Go ahead, Ms. Dewitt.

8        MS. DEWITT:  Your Honor, as an initial matter, I

9   would just like to say for the Court's benefit, that because

10:40:14 10  we have argued this motion, not once, not twice, but this

11  would be the third time.  And because we've all submitted

12  extensive briefing on this issue, there's not really a lot I

13  believe that I can add, in terms of an oral argument.  And

14  I'm more than happy to submit, unless the Court has specific

10:40:30 15  questions.

16        As to particular issues, since the Court has asked

17  me about this, I think that the tentative lays out in

18  exacting details why this intent to kill is a bit of a

19  red herring and that they've misapplied the burden of proof.

10:40:46 20        Now, he's suggesting that, no, that's not what

21  they're saying; that there's no evidence that he intended

22  for anyone to kill.  The court has laid out in excruciating

23  detail -- I think, accurate detail -- that that is not borne

24  out by the facts at trial.  There's clear evidence, both

10:41:02 25  based in the context of his social media as to what his

10:41:06   1   intent was, that the particular videos that he endorsed and

2   liked, that set the context for it, which is supported by

3   his own statements saying, specifically, things, like, *the*

4   *military are the terrorists, and I now know who I want to*

10:41:20   5   *kill.  I now know who I want to take out.*

6          The fact that he felt compelled to take military

7   uniforms or to seek to have military uniforms brought to him

8   in Afghanistan and that he encouraged others to train and to

9   kill and that that all along from the very beginning was the

10:41:37  10   goal and the purpose of this group to go and kill, to fight

11   and kill, did offend Muslims and Muslim men against their

12   oppressors, the United States and the West.  That evidence

13   is throughout the entire trial.

14          And, frankly, there's really not much more I can

10:41:53  15   add to that, other than what the court has already pointed

16   out and what the Government has already submitted in

17   numerous lengthy briefings.

18          THE COURT:  All right.  Mr. Larsen.

19          MR. LARSEN:  Thank you, your Honor.

10:42:11  20          Again, I did not hear Counsel for the government

21   point to a piece of evidence at trial that Mr. Kabir joined

22   a conspiracy to kill, specifically, officers and employees

23   of the United States.  That evidence is simply absent in

24   this case.  There is evidence suggesting an intent to the

10:42:30  25   Court an enterprise to kill people, generally, which I'll

10:42:34  1   address when I talk about Count One.  But focus now on

2   Count Five, which charged, specifically, a plot to kill

3   American personnel.  There was no such evidence.  And I

4   think this is reflected by the jury's findings on Count One.

10:42:47  5       When the jury convicted Mr. Kabir of conspiring to

6   provide material support, it specifically declined to find

7   that Mr. Kabir conspired to materially support the killing

8   of United States personnel.  That's -- that is what its

9   verdict was on Count One.  I think that speaks volumes,

10:43:08 10   Your Honor.

11       Unreasonably, the jury convicted Mr. Kabir of

12   Count Five.  It made the right call on Count One when it

13   found that there was insufficient evidence to support that

14   charge that he had conspired to materially support killing

10:43:22 15   Americans.  Its finding on Count Five is the one that the

16   Court should vacate for lack of evidence.  Even if the Court

17   doesn't grant our motion under Rule 29, we, respectfully,

18   implore the Court to grant our motion for a new trial on

19   this count.  As the Court has recognized in its tentative,

10:43:39 20   the Court's discretion is very broad to grant a new trial

21   motion.

22       And, here --

23       THE COURT REPORTER:  Excuse me.

24       MR. LARSEN:  And, here, when looking at all the

10:43:50 25   evidence, objectively, rather -- in the light favoring the

10:43:53  1   government, the evidence falls short to support the

2   conviction under Count Five.  The evidence taken as whole

3   weighs heavily against the jury's finding that Mr. Kabir had

4   joined a plot to kill Americans, especially given the jury's

10:44:08  5   contradictory and correct finding that Mr. Kabir had not

6   conspired to materially support the killing of Americans

7   under Count One.

8            THE COURT:  All right.  Any other counts that you

9   wish to argue?

10:44:21 10            MR. LARSEN:  There are other counts that I wish to

11  argue, Your Honor.  I did want to address --

12            Moving, then, to Counts Two and Four, Counts Two

13  and Four were the counts that alleged that Mr. Kabir had

14  conspired to aid Al Qa'ida, either by joining Al Qa'ida, or

10:44:44 15  by receiving military-type training, on behalf of Al Qa'ida.

16  And, here, the evidence was insufficient in two respects:

17            First, the evidence would be sufficient that a

18  plan to join Al Qa'ida, as opposed to the Taliban, even

19  existed in the first place.  The evidence at trial was that

10:45:01 20  everyone, except Mr. Santana, had the plan to join the

21  Taliban.  That's what Mr. DeLeon said.  That's what

22  Mr. Gojali said.  And if one credits what Mr. Hammad said,

23  that's even what Mr. Kabir wanted to do.  They all wanted to

24  join the Taliban.

10:45:15 25            And we know from Dr. Sageman's testimony that at

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:45:17  1    least the Taliban was present in Afghanistan, unlike

2    Al Qa'ida.  Al Qa'ida had left Afghanistan years before

3    Mr. Kabir was there.  There was no possibility that they

4    would have joined Al Qa'ida, in Afghanistan.  And, in fact,

10:45:35  5    the evidence was, they wanted to join the Taliban which, of

6    course, was not the charge.

7             Now, there is a conversation in which

8    Mr. Santana --

9             THE COURT:  Well, there are a number of

10:45:45  10   conversations and there's -- well, at the very -- a number

11   of conversations where a number of possibilities are

12   discussed between, sometimes, two of the defendants,

13   sometimes a different subset of the defendants, sometimes

14   almost all of the defendants in which they discussed

10:46:09  15   students versus the professors.  They discussed different

16   possibilities where to go, whether to go to Pakistan,

17   whether to go to Afghanistan, whether to go to Yemen,

18   whether to go to Afghanistan first and then go on --

19            All of these things were discussed.  But there was

10:46:29  20   certainly, especially, as the date for departure got nearer,

21   it became -- the plans were solidified, and it became clear

22   that the plan, the conspiracy was to go to Afghanistan and

23   to join Al Qa'ida.  Again, at first, they might have to

24   join -- they might have to go to a training camp for the

10:46:52  25   Taliban, but the ultimate goal was Al Qa'ida.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:46:59    1          I mean, there are many discussions throughout the

            2   month.  But, especially, in the discussions right before

            3   November the 8th, the plan, as I said, solidified.

            4          MR. LARSEN:  I won't reiterate, Your Honor, what

10:47:10    5   we said in our briefing, which is that we, respectfully,

            6   disagree with the Court that there was sufficient evidence

            7   of that plan.  I won't repeat that here.

            8          I will make -- the second point I wanted to make

            9   under this count which is that, even assuming a plot to join

10:47:23   10   Al Qa'ida existed, there was insufficient evidence that

           11   Mr. Kabir was a member of that plot.  Again, there's a

           12   paucity of evidence as to Mr. Kabir's specific intent.  The

           13   government has pointed to the conversation where Mr. Santana

           14   asked, *Do you advance from the students to the professors?,*

10:47:41   15   meaning from the Taliban to Al Qa'ida.

           16          Mr. Kabir said, *Of course you do.*

           17          Now, we know that's wrong as a matter of fact.  We

           18   learned that from Dr. Sageman.  One does not progress from

           19   the Taliban to Al Qa'ida.

10:47:54   20          Moreover, looking at the totality of the evidence,

           21   even in the light favoring prosecution, it doesn't allow

           22   rational fact-finders to conclude beyond a reasonable doubt

           23   that Mr. Kabir wanted to join Al Qa'ida.  Let's look at all

           24   of the evidence.  The FBI, we know, had investigated

10:48:10   25   Mr. Kabir.  It feared that he was a wanna-be terrorist,

10:48:15  1   because he had contacted a website associated with Anwar,

2   A-N-W-A-R, Al-Awlaki.  There are various spellings of that

3   last name.

4          The FBI sent Mr. Kabir e-mails extensively from

10:48:38  5   Mr. Al Awlaki, or his representatives.

6          THE COURT:  I'm aware of all that, but I'm just

7   not persuaded by that.

8          MR. LARSEN:  Here's our point, Your Honor.  A

9   wanna-be terrorist or someone who truly idolized

10:48:48  10  Mr. Al-Awlaki, like the government claims, would have

11  respond when his supposed hero contacted him inviting him to

12  become a terrorist.  Someone who wanted to be a terrorist

13  truly would have answered a terrorist e-mail.

14         The lesson that we get from *Valle*, from *Jameson*

10:49:02  15  and from *Pantalagest* in the Tenth Circuit, is that a

16  literalist approach is not appropriate when the surrounding

17  evidence doesn't support conviction.

18         Here, the government at trial and now takes a

19  literalistic approach.  If Mr. Kabir said he had connections

10:49:19  20  to terrorists, then he must have had connections to

21  terrorists.  We know, as a matter of fact, that that is

22  impossible on the record here that an American who had spent

23  three months in Kabul, who didn't speak the language, who

24  had no friends, we know that there's no chance in reality

10:49:38  25  that he connected with terrorists who would rather kill him

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:49:40  1  or ransom him than recruit him into their ranks.

2          THE COURT:  There was no evidence of that.

3  There's no evidence of --

4          You had his father testify that he was afraid.

10:49:54  5  You had some very general testimony from the family that

6  they were afraid; that they thought that Kabul was a

7  dangerous place.

8          But going back to the example that I provided, you

9  could have four persons charged with conspiracy to rob a

10:50:08  10  bank and one of them exaggerating his knowledge, his inside

11  knowledge.  They take all the overt acts that I've described

12  and they go to rob the bank and they're arrested as they

13  enter the bank because they have conspired.

14          Now, the fact that one of them exaggerated and,

10:50:27  15  perhaps, lied to the others about his inside knowledge of

16  the layout of the bank does not mean that they have not

17  conspired to rob the bank.

18          MR. LARSEN:  I agree with your Honor that that's

19  possible, but I would like to highlight a particular piece

10:50:41  20  of evidence in this case that is absent from that

21  hypothetical situation but was present here.

22          When push came to shove, Your Honor, and the other

23  defendants said on the morning of the trip, *We're actually*

24  *coming,* Mr. Kabir communicated to Mr. DeLeon not to come.

10:50:58  25          Mr. DeLeon said, *I got the feeling he doesn't want*

10:51:00  1   *us to come.*

2         This is telling, Your Honor.  Mr. Kabir said a lot

3    of things during the month that he was communicating with

4    his friends.  So when push came to shove and you realize

10:51:11  5   they might actually be coming and they might actually expect

6    him to connect himself to Al Qa'ida, or to take them on a

7    mission, Mr. Kabir, having no such connection and having no

8    such ability to facilitate violence, panicked at the thought

9    that they were going to come.

10:51:27 10        Now, the government just ignores this.  But as the

11   Court knows, you can't ignore evidence when we're reviewing

12   the totality of the record for sufficiency.  And we

13   especially can't ignore it, Your Honor, on the new trial

14   motion.

10:51:40 15        Your Honor's broad discretion to look at all the

16   evidence in the case requires an objective look at

17   everything that was proffered at trial, including the

18   evidence that when push came to shove Mr. Kabir said*, Don't

19   come.*

10:51:53 20        THE COURT:  I disagree with that characterization

21   of the communication from Mr. Kabir.  I think that's a very

22   strained and exaggerated --

23        MR. LARSEN:  I will read into the record what the

24   evidence was, Your Honor.

10:52:07 25        *(Pause.)*

10:52:46  1          THE COURT:  If it's in the days leading up to --

2          MR. LARSEN:  It's the day that they were to leave;

3   the other defendants.  And, of course, as in most things,

4   whenever you're looking for something, of course, you can't

10:52:57  5   find it.  It's in my motion I quote what the evidence was,

6   and I believe it was Exhibit 567, where Mr. DeLeon is

7   telling the informant, Hammad, that he had just had a

8   communication with Mr. Kabir and he says to Hammad, DeLeon

9   says, *I got the feeling that he didn't want us to come, and*

10:53:18 10   *I don't think he wants to come anymore.*

11          And we submit that this is evidence that -- this

12   evidence also --

13          THE COURT:  But that's not Mr. Kabir talking.

14          MR. LARSEN:  That is correct.  But many things the

10:53:29 15   government has offered against Mr. Kabir are not things he

16   said.  A lot of the things -- this offers things that the

17   others said about him, so, you know, it cuts both ways.  I

18   think this piece of evidence also dovetails with the other

19   evidence.

10:53:41 20          Again, Mr. Kabir has said to the others, *I'll*

21   *arrange houses for you here.  I know a guy in Dubai who can*

22   *help you get visas.  I'm going to send you some phony*

23   *wedding invitations that are also going to facilitate your*

24   *traveling with me*.

10:54:01 25          Now, he said all of these things and there's not a

10:54:05   1   single piece of evidence that he lifted a finger to do any

2   of them.

3        THE COURT:  There's his statements over and over

4   with increasing specificity about his arrangements for

10:54:16   5   housing.  Some of which, as I pointed out in my tentative,

6   are substantiated:  That his relatives did leave for Turkey.

7   First, he said, *Gee, I think you all can stay in this house.*

8   *We can rent this house.*

9        Then, he says, *Well, my relatives are leaving, but*

10:54:37  10   *we can't rent this house, because -- but I found this other*

11   *apartment*.  And he talks about, as I said, with increasing

12   specificity, about all the apartments he's looked at and the

13   one that he found.

14        Very shortly before the date that the other

10:54:53  15   defendants were leaving, he talks about the number of rooms

16   and the rent.

17        MR. LARSEN:  We don't dispute that there are

18   things Mr. Kabir said that, if one takes a literalistic

19   approach, suggest guilt.  But we know that we can't take a

10:55:07  20   literalistic approach.  We know that from the *Valle*, the

21   *Jameson* and the *Pantalagest* cases.  We have to look at the

22   record.

23        Now, the record, here, is that when they said they

24   were coming, he told them not to, because he was panicked at

10:55:22  25   the thought that after talking big for so many months of

10:55:24  1   having these connections to international terrorists.  When

2   he thought that the others who actually did seem intent on

3   joining these groups might actually come and expect them to

4   help, he was panic struck at the thought of this, because he

10:55:39  5   had no such connections and no true intent to join these

6   groups.

7          That's our point in this case.  This prosecution

8   of Mr. Kabir from his perspective, from our perspective as

9   his advocates and defense team, has been this nightmarish

10:55:54  10  experience of being prosecuted for monstrously stupid things

11  that he said to his friends but things that he said to his

12  friends that, nonetheless, were not corroborated by his

13  actions.

14         He did not go on a mission.  He canceled the

10:56:14  15  supposed mission over and over.  He did not make connections

16  to terrorists.  He did not facilitate the others actually

17  coming to him.  And when they said they were, he fought

18  because he had no true intent to try to join Al Qa'ida and

19  kill people.  He is someone who out of boredom, or

10:56:34  20  loneliness, or sheer stupidity said a number of idiotic

21  things to his friends in an attempt to impress them.

22         When we look at the record of what he did, or more

23  telling, what he did not do, the record is insufficient to

24  support conviction.  If he wanted to be a terrorist, he

10:56:53  25  would have answered that e-mail from Anwar Al-Awlaki.  If he

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:56:58   1   wanted friends to join him so they could go kill people, he

2   would have relished their finally make the trip --

3          THE COURT:  Although the only evidence that you

4   can point to that he, in your words, panicked and didn't

10:57:08   5   want them to, was one statement not from him but from one of

6   the others saying, *I think he doesn't want to us come.*

7   That's it.

8          That doesn't sound like he panicked.

9          MR. LARSEN:  Respectfully, your Honor, that's not

10:57:21  10   it.

11          The art of the evidence in this case is that

12   although Mr. Kabir said a lot of things, he did nothing to

13   make reasonable conclusion that he really meant what he

14   said.  That was our theme throughout the defense.

10:57:34  15          Does one always mean what one says?

16          And the answer is, no, one doesn't always

17   necessarily mean what they say and, especially, when

18   charging someone with a conspiracy which, as you know, is

19   the kind of crime that doesn't require the actual commission

10:57:46  20   of a substantive offense.  It's an agreement.  One has to be

21   very careful that in reviewing the evidence it's sufficient

22   to really prove beyond a reasonable doubt that this person

23   is guilty.

24          We know that the charges are serious here.  We

10:57:59  25   have to be careful in our review of the record, especially

10:58:02  1   because there is a very strong tendency to just sort of go

2   along with conviction, given the fact that two of the

3   defendants --

4           THE COURT:  Well, if you're suggesting that I have

10:58:12  5   just gone along --

6           MR. LARSEN:  No, your Honor.  Forgive me.  I have

7   not.

8           THE COURT:  I think the detail that is contained

9   in the tentative ruling would dispel that notion.  I could

10:58:23  10  have ruled from the bench, orally.  But because of the

11  seriousness of the charges and because I think it's my

12  responsibility to do so, I have reviewed the very great

13  amount of evidence that both sides presented in this case

14  and explained my reasoning.

10:58:47  15          I agree that it's not -- well, in any case, the

16  court should not just go along with a jury's verdict, but I

17  hope the record is clear here that that's not what's

18  occurred.

19          MR. LARSEN:  And forgive me if I suggested it.  I

10:59:03  20  did not mean to, Your Honor.

21          I think the point that I was trying to make,

22  inartfully, is that here we have a case where there are four

23  defendants.  Now, we have a substantial amount of evidence

24  about the first three because of the surveillance and

10:59:17  25  because of the informant and, in fact, all three of those

10:59:20   1   defendants admitted they were guilty.  The first two pleaded

2   guilty and the third, although he went to trial, he admitted

3   guilt in the proffer session.

4          Mr. Kabir, who was not with them, has --

10:59:31   5          THE COURT:  That's all -- that's all in the

6   papers, and I've read that.

7          MR. LARSEN:  And so, from the defense's

8   perspective, we have this prosecution of -- we have

9   Mr. Kabir being swept up in a prosecution of three people

10:59:46  10  who did, in fact, admit guilt and we have assured the court,

11  who is their friend, who's being swept up in the

12  government's prosecution.  I think it's very telling if we

13  look at what the jury did do in this case, Your Honor.  The

14  jury did not come back the same day, or the day after, or

11:00:00  15  the day after that.

16          THE COURT:  They struggled.  They thought

17  carefully.  They asked questions.  And they didn't convict

18  on all counts.

19          MR. LARSEN:  Right.

11:00:06  20          THE COURT:  All of which I think cuts against your

21  argument.  I think it shows that the jury considered

22  carefully all of the evidence presented in seven weeks of

23  trial -- six, or seven weeks of jury.  If the jury had come

24  back very quickly, I think that would have been surprising

11:00:25  25  for either side because of the amount of evidence.

11:00:29  1          MR. LARSEN:  They not only took a long time

2    reviewing the amount of the evidence, but they specifically,

3    of course, acquitted Mr. Kabir of conspiring to kill,

4    kidnap, or maim abroad, as charged in Count Three and,

11:00:40  5    specifically, found he had not conspired to materially

6    support killing Americans.  Yet, nonetheless, explicitly

7    convicted him on Count Five, for which as we said there's no

8    evidence to support that.

9          I think even if the Court finds that there is

11:00:58 10    sufficient evidence as to Count Five -- although we haven't

11    located any and the government hasn't located any -- I think

12    that's also something when neither side can point to

13    evidence that is required to sustain conviction on a

14    particular count --

11:01:13 15          THE COURT:  The government just stood up and did

16    point to some, but go ahead.

17          MR. LARSEN:  It said that he wanted -- that he

18    encouraged his friends to come over, knowing that they

19    wanted to kill.  But, again, Count Five requires something

11:01:24 20    more specific than that.  Count Five is a plot to kill,

21    specifically, employees -- officers and employees of the

22    United States.

23          THE COURT:  And --

24          MR. LARSEN:  And there was no evidence of that.

11:01:34 25          THE COURT:  And Ms. Dewitt did also refer to the

11:01:37  1   postings in social media about killing members of the

2   United States Forces.

3           MR. LARSEN:  And far more disturbing material than

4   that appeared in the *Valle* case and in the *Jameson* case,

11:01:52  5   where in *Valle*, the defendant is talking about kidnapping

6   and killing specific people.

7           THE COURT:  But the difference, as I've pointed

8   out in my order, is that there was nothing else, and in our

9   case there is much else.

11:02:04  10          MR. LARSEN:  Your Honor is correct that the

11  difference here is that unlike in *Valle*, here, the other

12  defendants did do things to move the plan along.

13          THE COURT:  And so did Mr. Kabir by directing him

14  to do those things.

11:02:17  15          MR. LARSEN:  The direction -- Your Honor,

16  Your Honor I believe says in the tentative that he

17  encouraged the others.

18          THE COURT:  He gave them specific instructions,

19  including, for example, saying, *Go to my parents' house and*

11:02:28  20  *get my old Army uniforms and bring those over to me*, which

21  is pretty telling.  But many other things, saying, *When you*

22  *work out, do squats and do other things to strengthen*

23  *certain parts of your anatomy, because you'll be carrying*

24  *bodies off the battlefield.*

11:02:52  25          I mean, these are specific instructions.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:02:52  1          *When you pack to join me, buy these things but*
       2   *don't buy these things, because you won't need them, or*
       3   *you'll be able to buy them cheaper here.*

       4          These are very specific instructions and
11:03:04  5   directions that he gave.  It's entirely different from what
       6   happened in the *Valle* case.

       7          MR. LARSEN:  They are not different in terms of
       8   the specificity.  In *Valle*, the defendant had made very
       9   specific statements about the tools that he had to
11:03:17 10   facilitate kidnapping these specific women.  He talked about
      11   a house upstate.  He talked about a stun gun.  He talked
      12   about a human-size oven that was going to facilitate cooking
      13   the victims.  He was very specific, and the things he said
      14   were absolutely terrifying.

11:03:31 15          THE COURT:  And none of them were done.  In this
      16   case, they were done.  The co-defendants went and spent --
      17   Mr. DeLeon spent a lot of time finding shooting ranges that
      18   had AK-47s that they could rent to practice because that was
      19   the kind of weapon that Mr. Kabir told them that they were
11:03:54 20   going to use in Afghanistan.  That's just one example of the
      21   specific sort of instructions he gave and they followed.

      22          MR. LARSEN:  Your Honor is correct.  The other
      23   defendants did do these things, but --

      24          THE COURT:  At his direction.

11:04:08 25          MR. LARSEN:  Or because they wanted to do it.  He

11:04:10   1   was encouraging them.  But the point we've made in our

  2   briefing is that encouraging others to commit a crime is not

  3   a conspiracy.  The *Melchor-Lopez* case, *the Estrada-Macias*

  4   case, knowing about, acquiescing in, approving of others'

11:04:24   5   criminal intent is not proof of conviction -- excuse me, is

  6   not proof of conspiracy.  Because for a conspiracy

  7   conviction, the individual defendant has to not only approve

  8   of someone else's criminal intent but, specifically, make

  9   the choice to join that enterprise with the requisite

11:04:43 10   criminal intent.

11          THE COURT:  And, of course, according to the

12   evidence, the idea to go to Afghanistan and engage in

13   violent jihad was Mr. Kabir's idea before he left the

14   United States.  He asked Santana and DeLeon to join him in

11:05:01 15   that before he left.

16          MR. LARSEN:  And, Your Honor, if the jury can

17   credit that evidence, it would have convicted Mr. Kabir of

18   Count Three.  It acquitted him of Count Three which, as

19   Your Honor will recall, had the requirement that the plan be

11:05:16 20   made while all the defendants are in the United States.

21          By acquitting Mr. Kabir of Count Three, the jury

22   made a finding that the evidence was insufficient to prove

23   that any plan, if it existed, was formed when Mr. Kabir was

24   in the United States.

11:05:31 25          I think the mix of verdicts here in this case are

11:05:34  1   telling.  I think there was a lot of evidence against the

2   three other defendants and that's why they pleaded guilty.

3          The reason that Mr. Kabir went to trial, was

4   because he's not guilty.  And the fact that he's now been

11:05:45  5   convicted of four of these five counts, from our respected

6   defense and his, it's this kind of nightmare, because he's a

7   man who's talking to his friend and, yet, when push came to

8   shove, did nothing to actually effectuate a plan to kill

9   anyone.

11:06:05  10          And I don't want to belabor this any further,

11   unless the Court has particular questions, but our principle

12   point here at oral argument, I think, is to emphasize the

13   paucity of evidence on Count Five.  And, Your Honor, even if

14   the Court finds that evidence minimally sufficient under the

11:06:25  15   Rule 29 standard, we think the conviction should be vacated

16   and set for a new trial under our new trial motion.  Because

17   when looking at the evidence, objectively, there simply is

18   none of an agreement to kill Americans.

19          Specifically, on Rule 33 motion, the Court is

11:06:40  20   aware you can waive the evidence yourself.  You don't have

21   to defer to the jury's finding, and you don't --

22          THE COURT:  And I've described --

23          MR. LARSEN:  Yes.

24          THE COURT:  -- my weighing of the evidence.

11:06:53  25          MR. LARSEN:  But, here, that rule of law, it's

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:06:55  1    interesting.  It has no application as to Count Five.

2    There's no evidence to weigh.  There's simply no evidence

3    that Mr. Kabir joined the conspiracy aimed at killing

4    Americans.  There's none.

11:07:07  5              THE COURT:  All right.  Ms. Dewitt.

6              MS. DEWITT:  I just want to address a couple of

7    very brief issues that are not in the record fully.

8    Specifically, I'd like to start with this reference to the

9    reluctance from Mr. Kabir to have them join him.

11:07:28 10             I did find it in the record, and it's in our

11   appendix.  It's at transcript dated 11/16 and, specifically,

12   on page 5.  And what Counsel has neglected to point out, or

13   reference, or respond to is that following this discussion

14   where Mr. DeLeon said he thinks that, maybe, Mr. Kabir may

11:07:48 15   be reluctant, he's asked what was Mr. Kabir's response by

16   the confidential source.

17             And Mr. DeLeon says, *He said, no, no, no.  It's*

18   *not that.  You guys are just stressing out, you know.*

19             And he, then goes on to -- to discuss about the

11:08:08 20   fact -- discuss how Kabir is upset with them, because

21   they're delaying.  They're going to Turkey first.  When you

22   look at this entire conversation in its context, it's very

23   clear that Mr. Kabir, in fact, quite the opposite of what is

24   suggested by counsel, is not saying that there's any

11:08:25 25   reluctance.  He's actually saying, *No, no, no.*

|  |  |
|--|--|
| 11:08:29 | 1 |
|  | 2 |

THE COURT:  What exhibit number is that?

MS. DEWITT:  That is 597, your Honor.

MR. GRIGG:  Apparently, it takes three.

MS. DEWITT:  567, your Honor.

THE COURT:  All right.  Thank you.

MS. DEWITT:  Second, Your Honor, with respect to the issue of whether or not there's evidence showing Mr. Kabir's specific conspiracy to join Al Qa'ida, in addition to all of the things the Court has already noted in the tentative, as well as what the government has already set forth in its papers, I would remind the Court of another conversation in which Mr. DeLeon and Mr. Kabir are, specifically, talking about Al Qa'ida.  And I'm sorry, I don't have the specific date or exhibit number for this, but you may recall it.  They're talking about Al Qa'ida, and they're talking about which school of thought Mr. Kabir is following and which school of thought Al Qa'ida follows, and they have a discussion about which *madat* they should follow.

And at the end of the conversation, Mr. DeLeon says, *Look, when we get there, you will be the emir and we will follow whoever you choose*, which again is just further evidence of the meeting of the minds and the consensus here, as far as what their ultimate goals are.

And, finally, Your Honor, I just want to respond to the suggestion that in response to Mr. Anwar Al-Awlaki

| 11:10:34 | 1 | that the defendant had no response.  And I would |
| | 2 | respectfully submit, Your Honor, that in fact Mr. Kabir had |
| | 3 | the most profound response of all and that is, that he began |
| | 4 | to promote the propaganda of Anwar Al-Awlaki through social |
| 11:10:49 | 5 | media.  He got a group together to go over and fight in |
| | 6 | Afghanistan.  He helped them plan those efforts.  He even |
| | 7 | went to Afghanistan and he continued to encourage his |
| | 8 | co-defendants to come with him.  That is, maybe, not a |
| | 9 | response by e-mail; but it is, in fact, the most profound |
| 11:11:12 | 10 | response one can give to the callings of Anwar Al-Awlaki, |
| | 11 | which is to take those ideas, to promote those ideas and to |
| | 12 | take actions on those ideas. |
| | 13 | And that's what Mr. Kabir's co-conspirators did. |
| | 14 | THE COURT:  Could you respond to the argument that |
| 11:11:25 | 15 | the jury acquittal on Count Three and its decision as to the |
| | 16 | second predicate count on Count One is somehow contradictory |
| | 17 | to a conviction on Count Five? |
| | 18 | MS. DEWITT:  First of all, I think that that |
| | 19 | assumes sort of a false starting point, which is that |
| 11:11:49 | 20 | what -- what the jury's deliberations and what went behind |
| | 21 | the jury's deliberations has any relevance to the decision |
| | 22 | that the Court is making here, which is:  Did a reasonable |
| | 23 | trier of fact -- could a reasonable trier of fact find in |
| | 24 | favor of the convictions in this case?, which the Court has |
| 11:12:06 | 25 | clearly indicated it believes could be -- has been |

11:12:10  1    established on the record.

2              So I think it started with a false premise that

3    their decision, one way or other, is relevant to that

4    analysis.  But, secondly, particularly with respect to the

11:12:21  5    956 count, Count Three, finding beyond a reasonable doubt

6    that there was a cohesive and complete conspiracy before

7    Mr. Kabir left the United States, which is what he's

8    suggesting, does not in any way undermine the fact that they

9    had those discussions and that they had those conversations

11:12:40  10   and that they had those plans.

11             The fact that the jury did not find beyond a

12   reasonable doubt, in favor of Count Three, is frankly not

13   relevant to the decisions on the other counts, as it's

14   clearly indicated by the fact that they did find that the

11:12:56  15   predicate for purposes of the material support count, as to

16   the 956 had been found, which further suggests that there

17   was some question in their mind as to exactly when that

18   conspiracy was ultimately formed and ultimately reached the

19   level of being beyond a reasonable doubt for purposes of

11:13:13  20   finding in favor of Count Three.

21             So I would suggest that those inconsistencies are

22   both irrelevant to the analysis here and do not in any way

23   undercut the conclusions that the Court found -- that the

24   jury found as to any of the other counts.

11:13:28  25             THE COURT:  All right.  Mr. Thomas.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:13:30   1          MS. DEWITT:  Can I just make one other thing,

2     Your Honor, just very, very minor?

3          On page 10 of the Court's tentative, the second --

4     the third pull paragraph about halfway down, the Court does

11:13:40   5     refer to a conversation on August 31st where Kabir discussed

6     with co-conspirator Gojali, I think that that's actually a

7     mistake.  I don't think that that was a conversation that he

8     had with Mr. Gojali.  I think it was Mr. Santana and

9     Mr. DeLeon.  And I --

11:13:58  10          Just because this tentative is so thorough and so

11     accurate in every other respect --

12          THE COURT:  I'll accept that.

13          MS. DEWITT:  -- I wanted to make sure that I

14     brought that to the Court's attention.

11:14:07  15          THE COURT:  All right.  Thank you.

16          All right.  Mr. Thomas.

17          MR. THOMAS:  Thank you, your Honor.

18          Your Honor, as you noted in your tentative, I'm

19     really making a Rule 33 and not so much a Rule 29 for

11:14:21  20     specific reasons, because kind of like my co-defendant

21     Counsel pointed out, the Rule 29 constricts the Court's

22     ability because you have to view the evidence in the light

23     most favorable to the government, et cetera, et cetera.  But

24     a Rule 33 lets Your Honor apply your own ideas and sense to

11:14:41  25     the matter.

And, specifically, for my purposes is the idea of
the interest of justice and was this a fair trial.  And, you
know, but for the *Mayfield* case coming out a couple months
ago, or a few months ago, I might not have felt as strongly
as I do now, because we exhausted just about every
entrapment argument and discussion possible.  But reading
*Mayfield* and reading *Jacobson* and some of the other Supreme
Court precedent that is the foundation for our entrapment
defense, I felt we got an unfair shake, because I felt that
the Court was requiring us to prove to the Court that
entrapment was found or should be found rather than leaving
it up for the trier of fact, the jury, to decide whether
entrapment applied.

            And so, it is -- it's that premise on which I
filed the motion.  And we did discuss at great length and
ad nauseam all of the facts for which the government
believed show predisposition and no inducement.  And I tried
to marshal the fact that show lack of predisposition and
government inducement.  But the bottom line is, all of our
contentions were just that.  They were contentions.  They
were argument based on facts.  And the jury did not have to
believe them.  The jury could have taken the facts and
chosen not to agree with them.  And so, it's really a
factual defense and not a defense as a matter of law.  And
because of that -- and because I wasn't able to open with

11:16:24  1    it, I felt like I started the case with an arm tied behind

2    my back.  And then, when the Court also added that if I

3    mentioned anything that might open the door to his proffer

4    statement, then his proffer could come into trial, then I

11:16:43  5    felt like I was also dancing on one foot.

6              So it was a very difficult and constrained

7    presentation of what I thought was a lot of evidence to show

8    my client was not guilty, but I think what was lost in all

9    of that was the jury didn't have to factually agree with any

11:17:03 10    of us.

11             And so, when you start with the government's

12    premise which is, there was this agreement well before the

13    informant came and acted that showed Mr. Kabir and the

14    co-defendants wanted to go overseas.  The jury didn't have

11:17:21 15    to agree with that.  And there was very, you know, I would

16    say little -- there was minimal evidence of that.  The only

17    evidence of that were some conversations after the fact and

18    a conversation on May 12th in the car between my client and

19    the informant about --

11:17:44 20             THE COURT:  I know which conversation you're

21    referring about.

22             MR. THOMAS:  Right.  About how, you know, it has

23    always been our plan, or it's also been our design to go, in

24    fact, and do these things.

11:17:55 25             Well, I think what the bulk of the facts showed in

11:17:59  1    this case was they didn't actually do anything.

          2            And with the entrapment defense being premised on

          3    the basis that my client would have done these things with

          4    or without the actions of the government informant, I think

11:18:16  5    that we can all agree that without the actions of the

          6    government informant, these things would not have been done.

          7            So it would have been okay for the jury to say, *We*

          8    *don't agree with that.  We don't think that Mr. DeLeon did*

          9    *have an agreement in May 26,* as we've described to

11:18:34 10    Mr. Hammad that they were going to do these things.  And the

         11    jury can say, *Well, we don't think that Mr. DeLeon would*

         12    *have sold his car to -- and would have withdrawn from school*

         13    *to be able to afford this stuff.  And we don't think*

         14    *Mr. DeLeon would have gone to the firing range, or would*

11:18:51 15    *have gone* to training --

         16            THE COURT:  But you can't even -- first of all,

         17    that really overlooks the law of entrapment, which has to

         18    show lack of predisposition.  And, here, we have your client

         19    telling the confidential informant of a preexisting plan.

11:19:10 20    But there's no -- even on the point you're now making,

         21    there's no evidence that it was Mr. Hammad's idea that they

         22    go and go to -- there's no evidence that it was Mr. Hammad's

         23    idea that they go to the firing ranges and practice with

         24    AK-47s.

11:19:29 25            The evidence is clear that -- well, first of all,

11:19:33  1   Mr. DeLeon spent a lot of time finding a range that -- where

2   they could, as I said already, rent AK-47s -- because they

3   didn't own them -- and get the ammunition.  And that was at

4   Mr. Kabir's direction, not Mr. Hammad's.

11:19:50  5        MR. THOMAS:  No, I understand that, Your Honor,

6   and I think it is with a renewed vigor after reading

7   *Mayfield* and re-reading the law on entrapment that I think

8   one issue got overlooked, and that was the element of

9   predisposition isn't necessarily to be shown at the time the

11:20:11 10  defendant accepts the government's offer, which was

11  difficult in this case to prove that Mr. Hamid actually

12  offered a crime.  But it was whether defendant was

13  predisposed prior to the government's initial contact.

14  That's what *Mayfield* --

11:20:29 15        THE COURT:  How can --

16        MR. THOMAS:  So it was -- so that's when I stepped

17  back and said, *Well, what did we know prior to the informant*

18  *ever showing up at the mosque*?  And then, remind you that

19  the informant was at the mosque because of Santana,

11:20:49 20  agreeably, for all of them.  It wasn't for Mr. DeLeon.

21  Didn't even know Mr. DeLeon at the time.

22        So what did the government know and not just

23  before the informant came in?  But with the benefit of

24  20/20 hindsight, after the informant came in, what can the

11:21:08 25  government establish had happened before the informant ever

11:21:12   1   showed up, and including that May 26th conversation?

           2   Because even though they had learned about it after the

           3   informant came in, it was facts that should have been --

           4   that reverted back to before the informant acted.

11:21:25   5           So if we draw a line as to when the informant came

           6   to the mosque so we look at everything they knew before and

           7   everything that happened afterwards, it's easy so see that

           8   almost all of the actions, or overt actions that the

           9   government argued support the conspiracy, happened after the

11:21:46  10   informant came.

          11           THE COURT:  All right.  I think all of this has

          12   been covered in your moving papers and in my tentative

          13   ruling.

          14           MR. THOMAS:  Well, okay.

11:21:56  15           THE COURT:  Timing is not causation.

          16           MR. THOMAS:  I understand --

          17           THE COURT:  There's many other problems with this

          18   argument, including that *Mayfield* is an out-of-circuit case,

          19   and it doesn't really change the law.

11:22:05  20           MR. THOMAS:  I understand.  It's a new way of

          21   looking at it.  And because they have the same five-factor

          22   tests as the Ninth Circuit, I'm sure this may become an

          23   issue in the Ninth Circuit.  It's a new way of looking at

          24   the same thing, but with the focus being:  What happened

11:22:21  25   before the informant ever showed up?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:22:24   1         That's the point that I'm trying to make.

2         I'll leave with one last comment:  We know from

3    the agent's testimony why the informant was sent in and what

4    the initial directives were.  It was that watch, listen,

11:22:41   5    observe, report.  That was the edict that he was given.  We

6    know that that changed, and it changed to:  Let's pay for an

7    apartment and let's pay for this.  And let's take them on a

8    trip here and let's take them on a trip there.  And record

9    this in the car.

11:23:02  10         THE COURT:  Well, the recording would be within

11    the initial instructions.

12         MR. THOMAS:  True.  But it's not just the

13    recordings of the conversations in house when the informant

14    wasn't there.  It's deliberate reporting of conversations in

11:23:13  15    the car when the informant is there to start the topic of

16    the conversation.  So it wasn't merely listening.  It was

17    listening to his response to what I suggest.  Why did the

18    government do that?

19         If we just step back for a minute, why did the

11:23:33  20    government send in an informant and have them change their

21    direction from listen, observe and report, to act?

22         And I think we all know why.  I think we know that

23    the evidence was insufficient at the time the informant came

24    there.  So they could not have arrested Mr. DeLeon, and they

11:23:54  25    could not have arrested Mr. Kabir, or any of the defendants.

11:23:58  1    I think we all can agree with that.  And even after the

2    May 26th conversation in the car where the government says

3    *there's this revelation that there was a preexisting plan*,

4    if that had been enough, then they could arrested on

11:24:12  5    May 26th.  And they didn't.  Because it wasn't enough.  And

6    so, that's why they sent the government's informant to do

7    certain things.  They were actions within intended

8    consequences and that was the inducement action.

9         So even if we use the lie of when the informant

11:24:37  10   came as to whether there was predisposition or not, I don't

11   think we can really have a conversation that there wasn't

12   inducement and beguiling and trickery and lying and

13   harassment from the informant.

14        We know the jury didn't like the informant,

11:24:54  15   because we got a jury note that said, *You know, if we don't*

16   *like the informant, can we disregard everything he said on*

17   *direct?*, or something to those -- those -- that opinion.  So

18   they had -- the jury had problems with the informant, and

19   they had problems with what to do in light of that.  And

11:25:12  20   because they couldn't be instructed on entrapment, the jury

21   didn't know what they could do with that information.

22        THE COURT:  Well, you argued entrapment, despite

23   the fact you were barred from doing so, you expressly

24   disobeyed the Court's ruling and your entire closing -- and

11:25:34  25   we've only quoted a little part of it in the tentative, just

11:25:37   1   for flavor -- was entrapment.  So they had the argument.

2   You were not prevented from putting on any evidence.  They

3   had --

4          You spent your entire closing arguing about the

11:25:53   5   informant and about entrapment.

6          MR. THOMAS:  But I didn't mention "entrapment."

7          THE COURT:  You didn't use the word "entrapment,"

8   but your entire argument was entrapment.

9          MR. THOMAS:  Your Honor, they -- I modified the

11:26:06  10   entire argument, based on the lack of entrapment

11   instruction.  So I argued lack of intent and that the intent

12   shown was the informant's intent and not my client's intent.

13          That's all I was left to argue, so that is what I

14   did argue.

11:26:22  15          But my point is, the jury did not -- they didn't

16   know what "entrapment" was, and --

17          THE COURT:  Because it didn't apply.  And that was

18   my ruling.

19          MR. THOMAS:  I understand that.  But I -- that's

11:26:35  20   why I asked Your Honor to step back.  What if knowing what

21   we know and knowing how long and arduous the trial was and

22   how long and arduous the deliberations was and the fact that

23   they really did consider each count carefully, they honed in

24   on a couple of counts, they acquitted Mr. Kabir on a count.

11:26:54  25   They were a very, very cautious jury and very, very good at

43

```
11:26:57   1    following the Court's instructions on what they could or
           2    couldn't do and were supposed to do.
           3            I can't help but thinking what if they were
           4    instructed on entrapment, they could have brought a whole
11:27:08   5    new angle into all of the evidence that was introduced with
           6    respect to Mr. DeLeon.  Because we all know that you can be
           7    guilty of all of the elements of a crime but, yet, still be
           8    found not guilty, if the government entrapped.  And so, it
           9    doesn't change the nature of the evidence.  It changes the
11:27:29  10    nature of the jury's analysis, so I --
          11            Regardless of how I argued it, it didn't matter a
          12    hill of beans to the jury, because they didn't even know
          13    they can consider entrapment.  They didn't know what it was.
          14    And I can't help but thinking if they did and they were
11:27:45  15    instructed on it --
          16            THE COURT:  All right.  You've said that now
          17    several times.
          18            All right.  Thank you.
          19            MR. THOMAS:  Thank you.
11:27:49  20            THE COURT:  All right.  Ms. Dewitt, or Mr. Grigg.
          21            MR. GRIGG:  Thank you, your Honor.
          22            I just want to address two brief points:
          23    Number one, I believe I heard Counsel at argument say it's
          24    very difficult to point to when the CHS, Mr. Hammad, offered
11:28:07  25    the crime.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:28:08  1        The problem here, of course, there's no evidence

2    and there's never been any evidence of inducement.  There's

3    no solicitation, offer, suggestion, request, anything by

4    anybody, other than Mr. Kabir that caused Mr. DeLeon to

11:28:21  5    start down this path, and that began in 2010.  And that

6    still hasn't changed.

7            THE COURT REPORTER:  Excuse me.  Slow down.

8            MR. GRIGG:  Second, with respect to *Mayfield*,

9    Your Honor, there's no change in the law in this circuit.

11:28:35 10  *Mayfield* is an occasion for the Seventh Circuit to discuss,

11   quite frankly, issues that the Ninth Circuit has already

12   discussed and the opinions relied upon in the court before

13   trial, during trial and again discussed in the tentative

14   that the Court has issued.  I checked last night.  I could

11:28:52 15  only find six cases that have ever cited *Mayfield*, the most

16   recent being on January 28th.  None of them are in our

17   circuit and most of them deal with sting operations.  As the

18   Court has recognized, this isn't a sting operation.  It's

19   never been in any fashion a crime suggested by the

11:29:06 20  government here.  None of those cases changed the analysis,

21   your Honor.

22           THE COURT:  All right.  Thank you all for your

23   argument.

24           Please return your copies of the tentative.  I'm

11:29:20 25  going to consider the arguments made today, and I'll issue a

```
11:29:27   1   final ruling probably near the end of the week.
           2          (At 11:29 a.m., proceedings were adjourned.)
           3
           4                          -oOo-
11:29:44   5
           6                        CERTIFICATE
           7          I hereby certify that pursuant to Section 753,
           8   Title 28, United States Code, the foregoing is a true and
           9   correct transcript of the stenographically reported
11:29:44  10   proceedings held in the above-entitled matter and that the
          11   transcript page format is in conformance with the
          12   regulations of the Judicial Conference of the United States.
          13
          14   Date:  April 28, 2015
11:29:44  15
          16
          17                      _____
                                     /s/DEBORAH D. PARKER
          18                      DEBORAH D. PARKER, OFFICIAL REPORTER
          19
          20
          21
          22
          23
          24
          25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*